**CARDINAL SPORTING GOODS COMPANY, Inc., and Leader Activity Company, Inc.**

v.

**Thomas F. EAGLETON, Attorney General of the State of Missouri, Daniel V. O'Brien, Prosecuting Attorney of St. Louis Co., Mo., and Raymond W. Hensley, Superintendent of Police of St. Louis County, Missouri.**

No. 62 C 121(3).

United States District Court
E. D. Missouri, E. D.

Jan. 11, 1963.

Orville Richardson, Stuart Symington, Jr., St. Louis, Mo., for plaintiffs.

Arthur R. Tucker, St. Louis, Mo., Wm. E. Gallagher, St. Louis Co. Counselor and Walter H. Smith, First Asst. Co. Counselor, St. Louis Co. (for defendant Hensley), for defendants.

Before MATTHES, Circuit Judge, and HARPER and REGAN, District Judges.

REGAN, District Judge.

This action was brought under 28 U.S.C. §§ 2281 and 2284, attacking the constitutionality of Missouri laws, RSMo 1959, Sections 563.690 to 563.730 (563.-690, 563.700 hereinafter referred to as "the Sabbath Breaking Laws" and 563.-720, 563.730 hereinafter referred to as "the Sunday Selling Laws"), V.A.M.S.

The Missouri Sunday Laws in their present form are as follows (RSMo 1959, Sections 563.690–563.730, V.A.M.S.):

"563.690. *Sabbath breaking.* Every person who shall either labor himself, or compel or permit his apprentice or servant, or any other person under his charge or control, to labor or perform any work other than the household offices of daily necessity, or other works of necessity or charity, or who shall be guilty of hunting game or shooting on the first day of the week, commonly called Sunday, shall be deemed guilty of a misdemeanor, and fined not exceeding fifty dollars."

"563.700. *'Sabbath breaking' construed.* Section 563.690 shall not extend to any person who is a member of a religious society by whom any other than the first day of the week is observed as a Sabbath, so that he observes such Sabbath, nor to prohibit any ferryman from crossing passengers on any day of the week; nor shall said section be extended or construed to be an excuse or defense in any suit for the recovery of damages or penalties from any person, company or corporation voluntarily contracting or engaging in business on Sunday."

"563.710. *Horse racing on Sunday.* Every person who shall be convicted of horse racing, cockfighting or playing at cards or games of any kind, on the first day of the week, commonly called Sunday, shall be deemed guilty of a misdemeanor, and fined not exceeding fifty dollars."

"563.720. *Selling goods on Sunday.* Every person who shall sell or expose to sale any goods, wares or merchandise, or shall keep open any ale or porterhouse, grocery or tippling shop, or shall sell or retail fermented or distilled liquor on the first day of the week, commonly called Sunday, shall, on conviction, be adjudged guilty of a misdemeanor and fined not exceeding fifty dollars."

"563.730. *Section 563.720 construed.* Section 563.720 shall not be construed to prevent the sale of any drugs or medicines, provisions or other articles of immediate necessity."

Plaintiffs seek a declaration and determination of the constitutional validity of the statutes and an injunction against enforcement.

Plaintiffs, Cardinal Sporting Goods Company, Inc., and Leader Activity Company are licensed concessionaires of G.E.M. Southway, Inc., and GEM Stores, Inc. (hereinafter referred to as "GEM"), respectively, which operate department stores in St. Louis County. The GEM stores display and offer for sale at retail a wide variety of goods through numerous licensees operating under written license agreements. Plaintiffs, in their departments, sell items including all types of leather goods, toys from games to bicycles, fishing and hunting equipment, and all types of sports gear and accessories, all more particularly set out in plaintiffs' Exhibit 6. None of the goods sold by plaintiffs are drugs, medicines or provisions.

Admittance to the GEM stores is limited to holders of GEM membership cards. The cards are issued primarily to Government employees, military per-

sonnel including reservists, employees of religious, scientific and charitable institutions, and employees of firms doing substantial Government work.

The licensees are financially independent of the GEM corporate structure. Their relationship is that of licensee and licensor as set out in their respective license agreements. Under the agreements the licensor shares in the profits from the sales of the licensee. The agreement provides that the licensee therein named agrees "to keep said department open for business during such hours and at such times as GEM shall designate" and "to conduct sales * * * only when and in such manner as GEM shall approve". The licensee further agrees "to operate said department in accordance with all laws, ordinances and regulations as may apply thereto, in the name of GEM, and in full and complete harmony with such policies and standards as GEM may prescribe therefor from time to time, and in a manner satisfactory to GEM and conforming with its taste, fancy and discretion in all respects and at all times, and every decision of GEM with respect thereto shall be final, absolute and conclusive".

Both GEM stores and all departments have been opened for business on Sunday since they began operating up to and including January 7, 1962, with the exception of the liquor departments and in the Southway store, the grocery department.

On December 11, 1961, the Supreme Court of Missouri (en banc) rendered its decision in State v. Katz Drug Company, 352 S.W.2d 678, holding Sections 563.720 and 563.730 RSMo 1959, V.A. M.S., constitutional. Defendant, Eagleton, Attorney General of the State of Missouri, gave warning, immediately after the issuance of the Katz decision, that continued violations of the Sunday Selling Law might lead to injunction or ouster proceedings as a means of enforcement, and after a meeting with defendant, Norman Anderson, Prosecuting Attorney of St. Louis County, and others, a decision was reached to bring a quo warranto or injunction proceedings against persistent violators. Voluntary compliance with the law was sought by defendants, and most of the persons and corporations previously selling and exposing for sale items not excepted by the law expressed an intention to comply.

GEM, on December 29, 1961, called a meeting at which all of the licensees, including plaintiffs, were represented. An officer of GEM submitted a plan whereby GEM would reply to the prosecuting attorney informing him of GEM's position that the law did not apply to GEM; that the GEM stores would remain open on Sunday; that counsel would be retained to represent GEM and the licensees in any litigation that might be instituted; that the costs of such litigation would be divided between GEM and its licensees. The plan was deemed accepted by the various licensees unless objected to. Under date of February 8, 1962, plaintiffs were billed for $710.00, the charge being labeled "Expenses incurred in the legal processing of GEM's position regarding Missouri's Sunday Selling Law" and the charge was paid.

Subsequently, GEM publicly announced its intention to remain open and expose its entire merchandise for sale. Defendants advised GEM officials and counsel that such conduct would meet with enforcement by arrest of those persons violating the statute.

On January 6, 1962, counsel for GEM filed suit in the name of GEM International, Inc., GEM Stores, Inc., G.E.M. Southway, Inc., and Lindberg Auto Supply Inc., against the defendants involved here, that action being No. 62 C 8 (hereinafter called the "GEM suit"). On Sunday, January 7, 1962, the two GEM stores were open for business as usual, and the St. Louis County police arrested over seventy employees of the various licensees including one or more employees of plaintiffs.

On January 9, 1962, defendant Eagleton filed an Information in the nature of Quo Warranto (hereinafter referred to as the "Quo Warranto Proceeding") in the Supreme Court of Missouri against

GEM and thirteen GEM licensees, not including plaintiffs in this action. The Quo Warranto petition alleged that the Sunday Selling Law was clear, that it applied to GEM and its licensees and prayed that respondents' charters be revoked or a fine imposed because of their persistent violations of the law.

On January 10, 1962, representatives of GEM and of the defendants in the GEM suit met to discuss the pending actions. At the end of the meeting, GEM publicly announced that it would, and in fact later did, dismiss a federal court case in the United States District Court for the Western District of Missouri involving the same constitutional questions, not ask for a temporary restraining order in the GEM suit, and would close on Sundays until the constitutional issues were finally ruled on. GEM, on or about January 11, 1962, notified its licensees including plaintiffs that it would henceforth be closed on Sunday. The testimony indicated that, in the meantime, officers of plaintiffs' parent company, Gateway Sporting Goods Company, conferred with counsel and made an independent decision to close their departments on Sunday, January 14, 1962.

On or about January 13, 1962, defendants Eagleton, Anderson, and Reardon, Circuit Attorney of the City of St. Louis, and William Collett, Prosecuting Attorney of Jackson County, Missouri, prepared a list of articles and categories of merchandise which they considered to be items proscribed by the Sunday Selling Law and distributed the list to prosecutors throughout Missouri.

The parties to the Quo Warranto Proceeding submitted to the court a stipulation of facts, and a proposed quo warranto decree. The Missouri Supreme Court entered a final decree in accordance with the stipulation and proposed decree, holding GEM's closed door membership policy did not place it and its licensees outside the purview of the Sunday Selling laws and ordered in part:

"That respondents and all licensees of GEM INTERNATIONAL, INC., or any subsidiary thereof in Missouri, and all persons acting by, through or under them or any of them be and they are hereby, in Missouri, permanently ousted from the practice of exercising their respective franchises, privileges, rights and licenses bestowing upon them the right to engage in business within the State of Missouri, in such manner as to expose to sale or sell on Sunday in any GEM store, to any and all persons, including holders of membership cards issued by GEM INTERNATIONAL, INC., GEM STORES, INC., and G.E.M. SOUTHWAY, INC., goods, wares and merchandise which are not drugs or medicines, provisions or other articles of immediate necessity."

None of the constitutional issues raised in this suit were raised in the Quo Warranto Proceeding.

Sometime in March, the Executive Vice President and Treasurer of Gem International, Inc., contacted the Executive Vice President and Treasurer of Gateway Sporting Goods Company, inviting Gateway to join in the GEM suit. Subsequently, after conferences with counsel, Gateway officers gave authority and consent to the filing of this suit, which filing was dated March 23, 1962.

Defendants moved for dismissal of the complaint on the ground that the prior pending action, Gem International, Inc., et al. v. Thomas F. Eagleton et al., No. 62 C 8, is based on the same cause and claim and that plaintiffs in this action are in substance and effect plaintiffs in that action; and on the further ground that plaintiffs are not real parties in interest, but only nominal parties controlled by plaintiffs in Gem International, Inc., et al., v. Thomas F. Eagleton et al., Cause No. 62 C 8 (hereinafter called the "Gem Suit"). This action and the Gem suit were heard together May 14, 1962. At the close of the plaintiffs' case and at the close of the entire case, defendants filed joint motions for dismissal asserting failure of plaintiffs to establish juris-

dictional amount in controversy. Ruling on these motions was reversed.

■ The complaint alleges jurisdiction by virtue of either 28 U.S.C. § 1331 or 28 U.S.C. § 1343. These allegations are controverted both by answer and motions for dismissal after hearing. There is no dispute that the complaint raises a Federal question but the amount in controversy is disputed. The burden is upon the plaintiff to support disputed allegations as to jurisdictional amount with competent proof. Zicos v. Dickmann, 98 F.2d 347 (8th Cir., 1938). Plaintiffs offer as evidence of jurisdictional amount a stipulation as follows:

"Subject to objections which the defendant will make, it is stipulated that each of the plaintiffs, meaning all of the corporate plaintiffs in both actions, has sustained a loss of net profits on an annualized basis in excess of $10,000.00, exclusive of interest and costs, based on sales of all goods, wares and merchandise exclusive of drugs, medicines, provisions, gasoline and tobacco."

■ The law is clear that the amount in controversy in cases of this kind is the value of the right to be protected against unconstitutional interference; measured by the loss which would result from enforcement. Kroger Grocery and Baking Company v. Lutz, 299 U.S. 300, 57 S.Ct. 215, 81 L.Ed. 251 (1936); McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). One of the objections of defendant to the stipulation as proof of jurisdictional amount, is that it does not properly measure the loss. It is the defendants' position that plaintiffs must exclude all items which may lawfully be sold, and further that since plaintiffs allege they do not know which items may lawfully be sold and which was proscribed by the statutes, any proof they offer is mere speculation.

■ It is true that unless plaintiffs take inconsistent positions, claiming vagueness for purposes of the merits on one hand, and using some standard to eliminate from their computation all articles which may be sold on Sunday, for jurisdictional purposes on the other hand, the figure of lost profits cannot be determined with any degree of exactitude. The standard of proof of jurisdictional amount, however, does not require certainty of amount. St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938). Present probability that the loss will exceed the jurisdictional requisite will suffice. See Friedman v. International Ass'n of Machinists, 95 U.S.App.D.C. 128, 220 F.2d 808 (1955); Food Fair Stores v. Food Fair, 177 F.2d 177 (1 Cir., 1949); Burndy Corp. v. Cahill, 196 F. Supp. 619 (D.Minn.1961).

The Sunday Selling Laws, Sections 563.720, 563.730 certainly proscribe Sunday sales of wider categories of goods than its exceptions permit. A comparison of the statute with the list of items which these plaintiffs offer for sale as shown by plaintiffs' Exhibit 6, indicates that the greater portion of plaintiffs' merchandise is proscribed. The stipulation, as offered, is clear and convincing proof as to the facts stated therein. Reading the stipulation, including the objections thereto, with the statute and list of items sold by plaintiffs leads this court to the inescapable conclusion that there is a present probability of loss which would exceed $10,000.00.

Defendants further contend that any loss of profits plaintiffs have or may suffer as a result of remaining closed on Sunday is due to the license agreement with GEM and not to enforcement of the law. By virtue of the license agreement, plaintiffs are required to conduct their operations in GEM stores during such hours as GEM shall designate. GEM's closure on Sunday, for any reason, necessitated the closure of plaintiffs' departments under the license agreement. Therefore, defendants contend no jurisdictional amount has been shown.

As we have stated in our opinion in the GEM case, the "voluntary" closure of the GEM stores following the law enforcement efforts does not support a

contention that jurisdiction is lacking. The submission of plaintiffs in that suit, and in this action, does not change the cause of the loss of profits. Likewise, the existence of a license agreement between GEM and plaintiffs does not substitute a new cause for the loss of profits. Plaintiffs in this action were subjected to arrests on January 7th and threats of enforcement. The law was directly enforceable against plaintiffs, and was directly enforced against them. There can be no question that as victims of the enforcement, plaintiffs would have standing to attack the validity of the statute. The contractual relationship between plaintiffs and GEM does not change the factual situation so that the injury, if any, is less direct.

It appearing, then, that jurisdiction has been established under 28 U.S.C. § 1331, it is unnecessary to examine the question of whether or not this action might be maintained under the Civil Rights statutes.

The next question that must be determined is whether or not the plaintiffs in this action are barred by reason of the quo warranto action. A number of licensees of GEM were specifically named and served as parties in the quo warranto action. Plaintiffs in this action, however, were not named. It is the contention of the defendants that plaintiffs' action here is barred on the face of the decree in the quo warranto proceeding; that plaintiffs have abdicated to GEM any rights they might have to expose goods for sale on Sunday and are bound by the orders of GEM; that plaintiffs agreed GEM should represent them; and finally that plaintiffs are not real parties in interest in this suit.

The questions raised are (1) whether in some sense, either by privity or representation, plaintiffs were parties to the quo warranto proceeding, and (2) whether or not plaintiffs are real parties in interest under Rule 17(a).

█ █ The information for a writ of quo warranto against GEM and certain licensees sought the drastic remedy of ousting the companies of their corporate franchises. The proceeding is one of the remedies for misuse or abuse of the franchises granted by the state and is directed against the exercise of the rights and privileges conferred upon the particular defendants. State on Inf. of Taylor v. American Ins. Co., 355 Mo. 1053, 200 S.W.2d 1; State ex inf. McKittrick v. Murphy, 347 Mo. 484, 148 S.W.2d 527. Privity requires mutual or successive relationship to the same rights in property. Bigelow v. Old Dominion Copper Mining & Smelting Company, 225 U.S. 111, 32 S.Ct. 641, 56 L.Ed. 1009; Litchfield v. Crane, 123 U.S. 549, 8 S.Ct. 210, 31 L.Ed. 199. The rights involved in the quo warranto proceeding were the rights of each corporation to exercise the privileges of its respective franchise. There is no doubt that the various defendants who were named in the quo warranto proceeding could have been proceeded against in separate suits. The facts concerning violations of state law or misuse and abuse of the corporate franchise would vary from case to case and the judgment, whether a fine, ouster, or conditional ouster in one case would merely be a precedent as to another, and not binding in any way. The fact that plaintiffs in this case and GEM have entered into a license agreement does not create a relationship of privity.

█ Neither were plaintiffs parties to the quo warranto proceeding by representation. Their relationship to the litigation involving GEM is not enough to denominate plaintiffs as parties in substance. A person not formerly a party, to be estopped by the decision, must have the right to participate and control the defense. Litchfield v. Crane, supra; Hy-Lo Unit & Metal Products Co. v. Remote Control Mfg. Co., Inc., 9 Cir., 83 F.2d 345. The evidence is that plaintiffs were represented at a meeting on December 29, 1961, wherein a spokesman for GEM outlined intentions of GEM, submitting that the plan would be assumed to have been accepted by the licensees unless they indicated otherwise. The plaintiffs along with the other licensees assented to an

arrangement to share a portion of the expense of any action which should be instituted. There is no evidence that plaintiffs had any actual control in the proceedings in the state court, and it is most doubtful that they had any right to control or participate in the defense of that action.

■■ The question as to whether or not plaintiffs are real parties in interest as required by Rule 17(a) F.R.Civ.P. has partially been dealt with. The rule merely means that he who seeks relief must have a right thereto by the substantive law. United States v. Allbaugh, D.C., 83 F.Supp. 109, modified on other grounds 8 Cir., 184 F.2d 109. This action involves the right to be free from unconstitutional interference. If the statute is unconstitutional as alleged, plaintiffs' property rights are directly affected. The statute operates directly on the plaintiffs. See Savage v. Jones, 255 U.S. 501, 32 S.Ct. 715, 56 L.Ed. 1182, compare Ex-Cell-O Corporation v. City of Chicago, 7 Cir., 115 F.2d 627 and cases cited therein. If the statute had been enforced against the licensees and not against GEM, the license agreement would not be relevant to a suit by a licensee such as is stated in the complaint in this action. The fact that enforcement was directed toward both GEM and the licensees, and both closed pending determination of their rights cannot convert the provisions of the license agreement into an assignment of substantive property rights to be free of unconstitutional interference in their sales.

■ The Court finds further that the complaint presents a proper case for the exercise of equitable jurisdiction and granting of equitable relief if the laws complained of are shown to be in contravention of the Federal Constitution. Federal Courts are reluntant to interfere with normal functioning of state enforcement officials unless exceptional circumstances exist showing that equitable relief is necessary to afford adequate protection of constitutional rights. Spielman Motor Sales Company v. Dodge, 295 U.S. 89, 95, 55 S.Ct. 678, 79 L.Ed. 1322 (1935); Hallmark Productions v. Mosely, 190 F.2d 904 (8th Cir., 1951). At the time the plaintiffs (and GEM) ceased exposing and selling their merchandise on Sunday, they were faced with the choice of probable repeated arrests and fines or a substantial loss of business. There would be no legal means of recovering such loss if plaintiffs' position were sustained. Furthermore, unless plaintiffs can persuade GEM to join them in opening their doors in order that plaintiffs may expose items for sale, no prosecution will result to give plaintiffs an opportunity to test their constitutional rights in an action at law. Imminent and irreparable injury with no adequate remedy at law have been shown. Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255. Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460.

It is suggested that even if this case is a proper one for the exercise of equitable jurisdiction, the Court should abstain in order that the constitutional issues might be presented for determination on the facts in this case to the State Court. It is defendants' contention that a state court interpretation might obviate the vagueness claimed, and that the construction of a state act is a question for the highest court of the state. The defendant cites Fox v. Washington, 236 U.S. 273, 35 S.Ct. 383, 59 L.Ed. 573; Musser v. Utah, 333 U.S. 95, 68 S.Ct. 397, 92 L.Ed. 562 and Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888. In Musser v. Utah, supra, and Government and Civic Employees Organizing Committee, CIO v. Windsor, 353 U.S. 364, 77 S.Ct. 838, 1 L.Ed.2d 894, a case in which the District Court, 146 F.Supp. 214, was directed to abstain, no state court had been presented with a case in which the constitutional questions had been advanced. There was no state construction of the statute in view of constitutional issues. In Fox v. Washington, supra, the court found that the state court's interpretation of the act on the same facts was in accord with common

usages of English and went no farther than was necessary to bring the defendant within it. Therefore the statute and its interpretation were not wanting in definiteness in that action. In Lanzetta v. New Jersey, supra, the court held that one cannot be bound to understand a challenged statute according to language of a court given subsequent to the conviction. The court considered the constructions given the statute by the state court but nevertheless, found the statute void for indefiniteness. The Missouri statutes involved in this case have been interpreted and construed on a number of occasions by the state courts. There is no need for further construction of the statutes by the Missouri Supreme Court prior to determination of the merits of this action.

Plaintiffs, in their complaint, attack the validity of the Missouri Sunday Laws on several constitutional grounds: (1) that they violate the 1st Amendment in that they were passed for religious purposes and to promote the establishment of a religion; (2) that on their face they violate the equal protection and due process clause of the 14th Amendment in that they are discriminatory in favor of persons who expose for sale and sell or perform work in connection with selling provisions and those who sell and expose for sale property other than "goods, wares and merchandise"; (3) that as applied and enforced they are discriminatory; (4) that the phrase "household offices of daily necessity, or other works of necessity or charity" in Section 563.690 renders that section unconstitutional in that the words and phrases are so vague and uncertain as to furnish no ascertainable standard of guilt, or warning to persons of what constitutes criminal conduct; (5) that Sections 563.690 and 563.700 violate the equal protection and due process clause of the 14th Amendment in that they discriminate against persons who observe Sunday as the Sabbath by making exception in favor of persons who as members of certain religious societies observe some other day as a Sabbath; and (6) that

Sections 563.720 and 563.730 are rendered unconstitutional because the phrase "articles of immediate necessity" are so vague and uncertain they furnish no ascertainable standard by which guilt may be determined or adequate guide to determine what might constitute criminal conduct.

■■■ Plaintiffs have no standing to attack the Sabbath Breaking Laws, Sections 563.690 and 563.700. Plaintiffs admit in the complaint that these sections have not been enforced for many years, and make no allegation or proof that these sections have been enforced against plaintiffs or their employees, or that there have been any threats or statements from the defendants of any intention to enforce those laws in the future. There is, therefore, no real controversy concerning these sections. See United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524; Asbury Hospital v. Cass County, 326 U.S. 207, 66 S.Ct. 61, 90 L.Ed. 6.

Plaintiffs' standing to attack the Sunday Selling Laws, Section 563.720 and 563.730 in their own behalf, is not questioned.

The attack on the selling statutes that on their face they are discriminatory in violation of the equal protection clause of the 14th Amendment was not pursued by proof at the hearing or by argument in the briefs. Except for the allegation in the complaint the parties have not disputed that the exemptions of "drugs, medicines, and provisions" and of "articles of immediate necessity" are reasonable classifications if the terms are capable of definition. Though the issue is not pursued in this case, it is interesting to note that the Supreme Court of Missouri, by way of dicta, regarded such a contention without merit, stating:

"No reasonable man will insist that the exceptions in section 2244 (563.730) in favor of the sale of articles of immediate necessity on Sunday rendered section 2243 void as unequal and arbitrary; on the contrary, it might well be contend-

ed that, in the absence of such qualification, the law was arbitrary and unjust in itself". (City of St. Louis v. DeLassus, 205 Mo. 578, 104 S.W. 12, 14.)

Counsel for plaintiffs stated at the hearing that it was their position that "there has been discrimination in enforcement between various types of businesses". Counsel further stated:

"There is a charge of discrimination, as in violation, of equal protection rights. That is a third constitutional point. We do not relinquish that point. We believe that it can be shown in part by the same evidence that is directed in part to show the invalidity of these statutes because of their violation of the 14th Amendment."

The evidence which might be viewed as in support of this theory was, as suggested by counsel, primarily directed toward a showing of vagueness. The inferences of possible unequal enforcement arise more from the questions asked by plaintiffs' counsel of certain prosecuting officers than from any positive testimony. The County Prosecuting Attorney, in reply to questioning, denied any actual knowledge of unlawful sales by other types of business, particularly flower shops and golf clubs or country clubs. The testimony was that all of the discount houses, drug stores and other businesses contacted by the enforcing officers, which, prior to January 7, 1962, had remained opened and exposed their entire stock for sale on Sunday, except for GEM and its licensees, had indicated an intention to close or attempt to limit exposition for sale to items excepted by the law. The evidence fails to support plaintiffs' contention of unequal enforcement.

Plaintiffs attack the statutes on their own behalf as promoting the establishment of a religion and on behalf of their employees as impinging the free exercise of religion. Defendants concede that plaintiffs have standing to raise the issue that the law promotes the establishment of a religion but challenge the standing of plaintiffs to attack the statute as prohibiting the free exercise of religion. Any standing plaintiffs may have to attack the statute on behalf of their employees assume the right of the employees, were they before the court, to raise the issue. It has already been determined that the Sabbath Breaking Laws, Sections 563.690, 563.700, are not in controversy, and the plaintiff has conceded that the Sunday Selling Laws, 563.720, 563.730, are directed against the shopkeeper only. If the religious liberty of the employees is impaired, they may assert these rights in their own behalf. Cf. National Ass'n for Advancement of Colored People v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488; Barrows v. Jackson, 346 U.S. 249, 73 S. Ct. 1031, 97 L.Ed. 1586; United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524. The only challenge of the statutes on religious grounds remaining, therefore, is that the Sunday Selling Laws promote the establishment of a religion.

The United States Supreme Court in McGowan v. Maryland, 366 U.S. 420, 431, 81 S.Ct. 1101, 1108, 6 L.Ed.2d 393, affirmed the holding of the Maryland State Court, 220 Md. 117, 151 A.2d 156, that the Maryland Sunday laws did not violate the Equal Protection or Due Process Clause of the 14th Amendment or constitute a law respecting an establishment of religion, within the meaning of the 1st Amendment. The Supreme Court viewed the whole body of Maryland Sunday laws in the light of the challenge based on the 1st Amendment. The Court stated:

"There is no dispute that the original laws which dealt with Sunday labor were motivated by religious forces. But what we must decide is whether present Sunday legislation, having undergone extensive changes from the earliest forms, still retains its religious character".

After reviewing the history of Sunday legislation and the evolution of the Maryland law, the Supreme Court accepted

the State Supreme Court's decision that the effect and purpose of the present statutes was not to aid religion but to set aside a day of rest and recreation. The Court further determined that the State was empowered to determine that a "common day of rest" would best accomplish its purpose, and that the common day should be one which most persons would select of their own accord. The Court cautioned that its holding did not go so far as to "hold that Sunday legislation may not be a violation of the 'Establishment' Clause if it can be demonstrated that its purpose—evidenced either on the face of the legislation, in conjunction with its legislative history, or in its operative effect—is to use the State's coercive power to aid religion". (366 U.S. page 453, 81 S.Ct. page 1119) See also Two Guys from Harrison-Allentown, Inc. v. McGinley, 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551; Gallagher v. Crown Kosher Super Market, 366 U.S. 617, 624, 81 S.Ct. 1122, 6 L.Ed.2d 536.

Sunday statutes originally were enacted to command the observance of the Lord's Day, and their titles, preambles and wording carried patently religious implications and purposes. By the latter half of the 18th Century, while still evidencing a concern with morality, changes in the Sunday Laws showed a trend to drop their theological direction and replace it with a dual purpose and increasing emphasis on a day of rest for its own value. See McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1153, 6 L.Ed. 2d 393 (Frankfurter, J., concurring). The first Sunday laws in Missouri were enacted in 1814, after the secularizing trend was well entrenched in other states. The Missouri Sunday laws never did require observance of religious beliefs on Sunday, and restricted very few activities other than labor. From the beginning the Missouri Statute exempted persons who observed another day as the Sabbath. The first State Supreme Court opinion, State v. Ambs, 20 Mo. 214, 215 (1854), which dealt directly with this constitutional issue, specifically rejected the contention that the law interfered with religious liberty, and though recognizing the law as one drafted by Christians to govern persons, the majority of whom were Christians, its effect was to provide a day free from labor and the turmoil and bustle of worldly pursuits. Every man was free to use the day as he chose, free to use it for religious purposes or not. The State Court opinion demonstrates that as early as 1854, the Court interpreted the statute as having a dual purpose. The secular purpose is recognized by the words:

"With what sorrow would the toil-worn laborer receive the intelligence that there was no longer, by law, a day of rest from his labor! The poor beasts of burden would soon find by experience, that our laws were no longer tempered by the softening influences of Christianity, and all the social advantages, which great and good men have attributed to the observance of Sunday as a day of rest, would be taken away." (Page 217.)

The secular purpose was reiterated by the Missouri Supreme Court in State v. Chicago, B. & Q. Railroad Company, 239 Mo. 196, 143 S.W. 785–786 (1912).

"The Missouri Sunday laws have regard to that day as a day of rest, and not to the religious character of the day. They are civil, not religious, regulations, and are based upon a sound public policy which recognizes that rest one day in seven is for the general good of mankind. Hennington v. Georgia, 163 U.S. 299–304, 16 Sup.Ct. 1086, 41 L.Ed. 166. Those laws are sustained as civil, municipal, or police regulations, without reference to the fact that the day of rest is also the Christian's day of rest and worship. State v. Ambs, 20 Mo. 214; State v. Granneman, 132 Mo. 326, loc. cit. 331, 33 S.W. 784; St. Louis v. DeLassus, 205 Mo. 578, loc. cit. 585, 104 S.W. 12; * * *."

As recent as 1926, the Missouri Supreme Court, in considering a St. Louis Ordinance requiring Sunday closing of

bakeries, held the Sunday Closing laws valid exercise of the police power and primarily industrial regulation.

The Missouri Statute has been enforced and construed by the Courts to effect a day of rest. In 1900, the Supreme Court of Missouri in Ex parte Neet, 157 Mo. 527, 57 S.W. 1025, strictly construed Section 563.710 which proscribes "[H]orseracing, cock fighting or playing at cards or games of any kind". "Game", the Court said, must be of the same class, kind, species, or genus as the enumerated activities. The game of baseball was held not to be within the terms of the statute, baseball not being a game primarily of chance nor productive of immorality. The court refused to construe the statute as prohibiting sports or amusements that were "neither immoral, nor hurtful to the body or soul".

▮ In the phraseology of the McGowan case, supra, it has not been demonstrated that the Missouri Sunday legislation, on its face, effects the purpose of establishing a religion. The legislation, on its face, by the selection of Sunday for a day of rest in a Christian society, and by the exemption in favor of persons who observe another day of the week as Sabbath, undoubtedly gives legislative blessing to individual observance of religion, but, at the same time, conscientiously seeks to avoid "establishment". Furthermore, while the legislative history of the Missouri Sunday Laws is brief, the judicial interpretation by the Supreme Court of Missouri has consistently been to construe the statutes as promoting a policy essential for the public good, and for the benefits derived from a secular day of rest. The statutes, so far as has been shown, have primarily served the secular purpose, independent of encouragement, if any, of religious observances.

The Sunday Selling Laws are finally attacked as being unconstitutionally vague. Plaintiff claims the words "articles of immediate necessity" are so vague and uncertain that they fail to give warning to individuals of what action constitutes criminal conduct, thus violating the due process clause of the 14th Amendment.

The applicable rule to be used in measuring a statute in view of a challenge of repugnancy to the due process clause is stated in Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law".

See also Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888.

▮ The statutory language must convey a sufficiently "definite warning as to the proscribed conduct when measured by common understanding and practices". United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). " * * * [T]he test is * * * whether adequate guidance is given to those who would be law-abiding". United States v. Five Gambling Devices, 346 U.S. 441, 458, 74 S.Ct. 190, 199, 98 L.Ed. 179.

The Courts have seldom dealt with phrases similar to the phrase "articles of immediate necessity" involved here. However, in United States v. Petrillo, 332 U.S. 1, 4, 67 S.Ct. 1538, 1540, 91 L.Ed. 1877, the word "needed" was determined to be sufficiently clear in a statute making it unlawful to force a radio broadcaster to employ " * * * in connection with the conduct of the broadcasting business as such licensee, any person or persons in excess of the number of employees needed by such licensee to perform actual service". The word "neces-

sary" as used in the Internal Revenue Code allowing deduction for "ordinary and necessary" business expenses was upheld in United States v. Ragen, 314 U.S. 513, 62 S.Ct. 374, 86 L.Ed. 383. The word "necessity" as used in the Sunday statutes of Pennsylvania and Iowa excepting works of "necessity" and "charity" from the prohibition of worldly employment or business was upheld as being plain when "the language is given its ordinary, not a strained, construction" by persons willing to abide by the law. Commonwealth ex rel. Woodruff, v. American Baseball Club of Philadelphia, 290 Pa. 136, 138 A. 497, 500, 53 A.L.R. 1027 (1927); State v. Linsig, 178 Iowa 484, 159 N.W. 995. In McGowan v. Maryland, supra, the court held that the Sunday Selling law allowing the sale of merchandise "essential to, or customarily sold at, or incidental to the operation of" bathing beaches was a sufficiently definite standard for persons of ordinary intelligence.

The Missouri Supreme Court and the Kansas Supreme Court are the only courts which have had occasion to interpret the words of the statute involved here. The Supreme Court of Missouri, in State v. Katz Drug Company, 352 S.W.2d 678, defined and limited the term "articles of immediate necessity" as used in the Missouri statute as follows (pp. 683, 684):

"* * * would include other articles as necessary as drugs, medicines or provisions and that this provides a standard that is not too vague for application. For example, dressings for wounds or splints or casts for broken bones are not drugs or medicines but are certainly of equal necessity; and as we have indicated articles immediately necessary to carry on work of necessity would surely be included".

And at page 685, the Court stated:
"* * * 'articles of immediate necessity' must be necessity to people generally rather than merely the necessity of a particular individual on a particular occasion."

The Supreme Court of Kansas, in State v. Hill, 189 Kan. 403, 369 P.2d 365 (1962) reached an opposite conclusion and held that the words had no meaning except the subjective judgment of the seller based on the subjective need of a purchaser. The North Carolina Supreme Court in G. I. Surplus Store, Inc. v. Hunter, 257 N.C. 206, 125 S.E.2d 764, followed the reasoning of the Kansas court in viewing a similar challenge of a statute excepting from Sunday closing the sale of "articles necessary for making repairs and performing services". Neither Court attempted to construe the statutes.

■ The definition of the Supreme Court of Missouri becomes a part of the statute. The construction placed upon the statute by that court is binding upon this court. Albertson v. Millard, 345 U.S. 242, 73 S.Ct. 600, 97 L.Ed. 983; United States v. Burnison, 339 U.S. 87, 70 S.Ct. 503, 94 L.Ed. 675; Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840.

■ As defined by the Missouri Supreme Court any interpretation based upon subjective judgments is eliminated and the statute calls upon the common understanding of persons of ordinary intelligence seeking to abide by the law. Thus defined, the statute meets the standard giving fair warning of what constitutes criminal conduct, and conforms to the due process requirements of the Constitution.

Accordingly, defendants are entitled to judgment in their favor dismissing plaintiffs' complaint with prejudice and awarding defendants their costs herein.

The foregoing memorandum will be adopted by the Court as its findings of fact and conclusions of law and judgment will be entered accordingly.

MATTHES, Circuit Judge (dissenting).

Cognizant of the rule that the constitutionality of a statute is presumed and that all doubts must be resolved in favor of its validity, I am nonetheless per-

suaded to believe that the excepting provision "other articles of immediate necessity" appearing in § 563.730, V.A.M.S., is vague, indefinite, and uncertain, rendering both §§ 563.720 and 563.730, V.A.M.S., repugnant to the due process clause of the Fourteenth Amendment to the Constitution of the United States.[1] Therefore, while concurring in the opinion insofar as it considers and disposes of the other issues, I respectfully dissent from the holding that the two mentioned statutes are valid and enforceable.[2]

In disagreeing with the majority on this issue, I am also disagreeing with the Missouri Supreme Court which sustained the validity of the Statute against the attack of unconstitutionality due to vagueness, in State v. Katz Drug Company, 352 S.W.2d 678, which holding was perhaps the moving force impelling the majority in the instant case to conclude that the Statute is valid.

Unlike decisions of the highest court of a state on matters of a state statute's *construction*, by which we are bound, adjudications by the highest state court on the constitutionality of a statute are persuasive only, and certainly a decision by the state court of last resort holding that a state statute is consistent with the federal constitution does not insulate and immunize the statute from another constitutional attack thereon in a federal

tribunal. Goesaert v. Cleary (E.D.Mich., S.D. 1947), 74 F.Supp. 735, aff'd 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163; United States ex rel. Touchy v. Ragen (7 Cir., 1955), 224 F.2d 611, 617.

As the majority opinion impliedly recognizes, it is well-settled that a statute may be so vague as to violate the due process clause of the Fifth or Fourteenth Amendments. A survey of the decisions of the Supreme Court of the United States which have developed this doctrine reveals that a number of factors may play a role in unconstitutional vagueness.[3] I deem it unnecessary for purposes of this dissent to attempt to enumerate or explore all of the factors which may from case to case become relevant. It is sufficient to observe that due process requires that a criminal statute be sufficiently definite in its terms to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Harriss (1954), 347 U.S. 612, at 617, 74 S.Ct. 808, at 812, 98 L.Ed. 989. In the oft cited case of Connally v. General Const. Co. (1926), 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322, the Supreme Court, in striking down an Oklahoma statute on the ground of vagueness, considered the

1. While mindful of the severability argument advanced by defendants, I am firmly convinced that §§ 563.720 and 563.730 must be construed as one statute in determining whether an offense has been committed. Thus, the two sections are so closely interrelated that a finding of unconstitutionality as to a portion of one section would require a nullification of both sections in their entirety. See State v. Hill (1962), 189 Kan. 403, 369 P.2d 365, for the interpretation given identical statutes by the Kansas Supreme Court.

2. For the purpose of this dissent, §§ 563.-720 and 563.730, commonly entitled the Missouri Sunday Selling Law, shall be referred to in the singular, as the "Statute."

3. See note "Due Process Requirements of Definiteness in Statutes," 62 Harv.L.Rev. 77, footnote 2, where it is stated that the doctrine was first mentioned by the Court in Ohio ex rel. Lloyd v. Dollison, 194 U.S. 445, 450, 24 S.Ct. 703, 48 L.Ed. 1062 (1904). It was first squarely recognized in Waters-Pierce Oil Co. v. Texas (No. 1), 212 U.S. 86, 108–111, 29 S.Ct. 220, 53 L.Ed. 417 (1909); it was first invoked to invalidate a statute in International Harvester Co. of America v. Kentucky, 234 U.S. 216, 34 S.Ct. 853, 58 L.Ed. 1284 (1914); and since that time and prior to 1949, the Supreme Court applied the doctrine in about forty cases.

question at some length and made these pertinent pronouncements:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. International Harvester Co. [of America] v. Kentucky, 234 U.S. 216, 221, [34 S.Ct. 853, 58 L.Ed. 1284]; Collins v. Kentucky, 234 U.S. 634, 638 [34 S.Ct. 924, 58 L.Ed. 1510]." 269 U.S. at 391, 46 S.Ct. at 127.

The Court quoted with approval from United States v. Capital Traction Co., 34 App.D.C. 592, as follows:

"'* * * The dividing line between what is lawful and unlawful cannot be left to conjecture. The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another.'" 269 U.S. at 393.

The foregoing requirement, applied by the courts with consistency since Connally, is the keystone factor in determining the issue of constitutional vagueness. Thus, in Cline v. Frink Dairy Co. (1927), 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146, a case involving the constitutionality of a Colorado statute, the Court, speaking through Chief Justice Taft, stated:

"We are now considering a case of state legislation and threatened prosecutions in a state court where only the Fourteenth Amendment applies; but that amendment requires that there should be due process of law, and this certainly imposes upon a State an obligation to frame its criminal statutes so that those to whom they are addressed may know what standard of conduct is intended to be required. And such is the effect of our cases. Connally v. General Construction Company, 269 U. S. 385, [46 S.Ct. 126, 70 L.Ed. 322]; International Harvester Company [of America], v. Kentucky, 234 U.S. 216 [34 S.Ct. 853, 58 L.Ed. 1284]; Collins v. Kentucky, 234 U.S. 634 [34 S.Ct. 924, 58 L.Ed. 1510]; American Seeding Machine Company v. Kentucky, 236 U.S. 660, [35 S.Ct. 456, 59 L.Ed. 773]; Waters-Pierce Oil Company v. Texas, 212 U.S. 86, [29 S.Ct. 220, 53 L.Ed. 417]; Fox v. Washington, 236 U.S. 273, [35 S.Ct. 383, 59 L.Ed. 573]; Omaechevarria v. Idaho, 246 U.S. 343, [38 S.Ct. 323, 62 L.Ed. 763]; Miller v. Strahl, 239 U.S. 426, [36 S.Ct. 147, 60 L.Ed. 364]; Tedrow v. [A. T.] Lewis & Son [Dry Goods] Co., 255 U.S. 98, [41 S.Ct. 303, 65 L.Ed. 524]; Weeds, Inc. v. United States, 255 U.S. 109, [41 S.Ct. 306, 65 L.Ed. 537] and Kinnane v. Detroit Creamery Co., 255 U.S. 102, [41 S.Ct. 304, 65 L.Ed. 531]." 274 U.S. at 458, 47 S.Ct. at 685.

See also Lanzetta v. New Jersey (1939), 306 U.S. 451, 453, 59 S.Ct. 618, 83 L.Ed. 888 and concurring opinion of Associate Justices Black and Douglas in United States v. Five Gambling Devices (1953), 346 U.S. 441, 453, 74 S.Ct. 190, 98 L.Ed. 179.

With due respect for the views of the Supreme Court of Missouri and my brethren, I have concluded that the challenged Statute does not meet the test as enunciated and applied by the United States Supreme Court for more than a century.

As observed by the Supreme Court of Missouri in Katz, supra, 352 S.W.2d at 681, the term "works of necessity" is found in the statutes of many states, and there have been many decisions which have dealt with its meaning. The provision here under consideration, "other articles of immediate necessity" is not common in state statutes pertaining to sales. It is readily apparent from the authorities cited in the Katz opinion, supra, 352 S.W.2d at 681, and from 28 Words and Phrases, "Necessity (Sunday Labor)," pp. 452–463, that the courts themselves have had difficulty with the meaning of the word "necessity," and certainly there is no unanimity of agreement as to its meaning when determining whether an Act that embodies it meets the due process requirements.

A Sunday Selling Statute, identically patterned after the Missouri Statute here involved and adopted by Kansas, was ruled unconstitutionally vague by the Kansas Supreme Court in State v. Hill, supra, 189 Kan. 403, 369 P.2d 365. Pointing out that the phrase "or other articles of immediate necessity" has no objective meaning, the Court stated:

"It becomes meaningful only when applied to a specific article purchased under varying circumstances, which leaves open the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can adequately guard against. * * * What may be an article of immediate necessity for one person to purchase on Sunday may be completely immaterial and even unwanted by another. Thus, whether an article is of immediate necessity depends solely upon the subjective judgment of one person based upon that of another." 369 P.2d 372.

The opinion of the Kansas Court was contrary to the position taken by the Supreme Court of Missouri in the Katz case, supra, 352 S.W.2d at 685, where the Court agreed with defendant's view that the Statute contemplates the needs of the community at large and asserted that individual subjective opinions need not be the guiding standard. The Missouri Court stated "that the standard of 'articles of immediate necessity' must be necessity to *people generally* rather than merely the necessity of a particular individual on a particular occasion." (Emphasis supplied.) Although the needs of a particular purchaser may not be relevant in ascertaining whether the Statute, which makes it a crime to merely *expose* forbidden goods to sale, has been violated, I nevertheless fail to see how, in practical effect, the Statute allows for any standard but a subjective one. The merchant is still required to determine for himself the needs of the community at large. In addition, since the Court's declaration that the Statute contemplates the requirements of people generally was made in relation to an evidentiary question rather than directly in response to the constitutional issue, I entertain some doubt as to its controlling effect. Nonetheless, I will accept the Missouri Supreme Court's "community" standard as binding and am still led to the irresistible conclusion that the Statute is unconstitutional. What is an article of immediate necessity to "people generally"? Does the classification change with more modern trends of thought and more modern standards of living? Does the "community at large" emcompass the entire State of Missouri, in which individual local communities might differ vastly in what they consider to be an "article of immediate necessity"? Or is the Statute to be interpreted on the basis of what the "people generally" of each community, whatever vague geographical area that term encompasses, feel, at a particular point in time, is a necessary article? Should a merchant in St. Louis County, such as plaintiffs here, base his judgment upon what the *current* interpretation in

St. Louis County would be or must he speculate as to what interpretation would be given by the average person over a state-wide area?

To me, the above questions emphasize the vagueness of the Statute and make the pronouncements of Connally v. General Const. Co., supra, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322, particularly pertinent. There, an Oklahoma statute was declared unconstitutional because of the use of the word "locality" and the term "current rate of wages." After holding that the term "current rate of wages" was vague, the Court stated:

"In the second place, additional obscurity is imparted to the statute by the use of the qualifying word 'locality.' Who can say, with any degree of accuracy, what areas constitute the locality where a given piece of work is being done?" 269 U.S. at 394, 46 S.Ct. at 129.

" * * * The result is that the application of the law depends not upon a word of fixed meaning in itself, or one made definite by statutory or judicial definition, or by the context or other legitimate aid to its construction, but upon the probably varying impressions of juries as to whether given areas are or are not to be included within particular localities. The constitutional guaranty of due process cannot be allowed to rest upon a support so equivocal." 269 U.S. at 395, 46 S. Ct. at 129.

The evidence in this case has fortified my view that the term "other articles of immediate necessity" is so vague that the Statute offends due process requirements. When the Supreme Court of Missouri ruled that the Statute was not void for vagueness, it would seem logical to conclude that the tests and standards promulgated by the Supreme Court of the United States above referred to, had been satisfied and that men of common or ordinary intelligence would no longer be required to guess at the meaning of the Statute. But apparently certain prosecuting officials were dubious as to whether men of ordinary and common intelligence could reasonably understand the precise conduct which the Statute proscribes. The evidence establishes that the Attorney General of Missouri, the Prosecuting Attorneys for St. Louis and Jackson Counties, Missouri, and the Circuit Attorney of the City of St. Louis, Missouri, shortly after the Katz opinion became final, prepared a "partial list of items not constituting drugs or medicines, provisions or other articles of immediate necessity" and circulated the list throughout the State of Missouri to other interested law enforcement officials. I fully understand that in the enforcement of any criminal statute prosecuting officials are of necessity permitted and indeed required to exercise administrative judgment and discretion in the matter of making the initial determination of whether a particular statute has been violated, but I am unaware of any rule of law which authorizes a segment of the executive branch of Government to engage in a type or form of legislating such as, in my opinion, the officials engaged in when they promulgated the partial list of non-necessities. If the meaning of the term "other articles of immediate necessity" is so obscure as to require prosecuting officials to substitute their judgment for that of law-abiding citizens of common intelligence, it would appear beyond cavil that the Statute does not comport to the requirements of due process.

Additionally, I note with some significance that the Attorney General of the State of Missouri apparently entertained some feeling that the questioned term might be susceptible to one meaning in certain sections of Missouri and to a different meaning in another section of the state. He testified, in summary, that he had stated that a "tolerably good argument could be espoused toward that end, namely, that there could be a geographical distinction between one area of the state and another." The Attorney General apparently based that conclusion upon his understanding of the holding of the United States Supreme Court in McGowan v. State of Maryland (1961), 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393.

In the McGowan case, the Supreme Court was faced with the Maryland Sunday Closing Laws which *specifically* contained a myriad of exceptions for various counties, districts of counties, cities and towns throughout the state. I fully concur that *clear* and reasonable territorial distinctions, perhaps based upon local tradition and custom, may be made by the legislature. I also agree with the Court in McGowan that business people of ordinary intelligence within a particular county would be able to know what exceptions are encompassed by a provision of a law exempting "merchandise essential to, or customarily sold at, or incidental to, the operation of" bathing beaches or amusement parks within the defined county. It is an entirely different matter, however, for the legislature to enact a vague all-pervading statute that may or may not be enforced uniformly throughout the state and which contains an exception that is based upon the needs of "people generally" rather than upon the more narrow and more easily ascertainable requirements of the operation of a particular type of endeavor within a particular, clearly defined local territory. If the meaning of the Statute, which on its face is statewide in scope, is so equivocal as to allow the sale of certain items in one section of the state and not in another, then in my judgment the constitutional guarantee of due process is violated.

Then too, and, finally, a member of the St. Louis County, Missouri, police department testified that he had instructed the police officers of the department "to use their common sense and not try to make an arrest on anything that might be considered in what we have come to know as the gray area, things that would be questionable."

Since the Statute does not define by any objective standard what constitutes a sale of articles of immediate necessity, the determination of that question is left to the court and jury. Such delegation of responsibility is not permissible. See

State v. Hill, supra, 189 Kan. 403, 369 P.2d 365. I am convinced that when the Statute is examined in the light of the applicable controlling principles, it is evident that the term "other articles of immediate necessity" is so vague that the citizen of ordinary intelligence must speculate as to what it encompasses. I firmly believe that the segment of our society which is engaged in the business of selling merchandise to the general public should not be required at the peril of being prosecuted and possibly convicted, to speculate or guess whether a certain article is one of immediate necessity. Attorneys, who advise these merchants, should be given adequate guide lines on which to base their opinions.[4] In my considered judgment, the Statute should be held unconstitutional and the problem left to the legislature of the State of Missouri to consider and resolve. Such a course would be consonant with the American concept of proper administration of justice and would be far more desirable than subjecting our citizens to prosecution for violation of a Statute, which even in the minds of the prosecuting officials, has doubtful meaning.

---

4. See, Due Process Requirements of Definiteness in Statutes, 62 Harv.L.Rev. 77, 80–81 (1948).